## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **JAMIE S. DIXON,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ.Act.No. 08-152-SLR |
| | ) | |
| **PERRY PHELPS**, Warden | ) | |
| and **JOSEPH R. BIDEN III**, Attorney | ) | |
| General for the State of Delaware | ) | |
| | ) | |
| Respondents. | ) | |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. §

2254, respondents state the following in response to the petition for a writ of habeas

corpus:

In the early morning hours of September 3, 2006, M.G., a 72 year-old woman,

was working at a Shore Stop service station in Laurel, DE.[1]  That evening, M.G. was

outside of the store, cleaning, when a black male (later identified as Jamie Dixon)

approached her and asked for help.  After entering the Shore Stop, Dixon grabbed M.G.

by the throat.  Dixon forced M.G. into a storage area in the back of the store, ripped her

clothes off, and forcibly raped her.  Dixon, unable to complete the act due to his

impotence, told M.G. that if she told anyone what had happened, he would kill her.

Dixon then gave M.G. her clothing back, forced her back to the front of the store, and

ordered her to empty the register.  Dixon then fled the store.

---

[1] The facts in this case are taken from the narrative retrieved from the DELJIS automated
criminal justice information system. (Ex. A)

1

The day after the robbery, another Shore Stop employee saw a photograph of the rapist - taken from the store's security camera - on the news and identified the man as Dixon. Towanda Miller, a friend of Dixon's family, also identified the man on the tape as Dixon. Two days after the robbery, the chief investigating officer (CIO) was informed that Dixon had been arrested on charges of criminal impersonation and was being processed at the Laurel Police Department. The CIO reported to the Laurel police station and asked Dixon if he was willing to speak with him. Dixon agreed, waived his rights against self-incrimination, and confessed to the crimes.

In April 2007, the petitioner, Jamie Dixon, pled guilty to first degree rape, first degree robbery, and second degree assault. *State v. Dixon*, 2007 WL 2694395 at *1 (Del. Super. Sept. 14, 2007); (Del. Super. Ct. Crim. Dkt. No. 0609002845, D.I. 17). In May 2007, Dixon was sentenced, as a habitual offender, to life imprisonment plus an additional term of years. *Dixon*, 2007 WL 2694395 at *3. Dixon did not thereafter appeal his convictions to the Delaware Supreme Court

In July 2007, Dixon filed a motion for postconviction relief, which was denied in September 2007. *Dixon*, 2007 WL 2694395; (*See* Del. Super. Ct. Crim. Dkt. No. 0609002845, D.I. 23, 27). The Delaware Supreme Court affirmed the Superior Court's denial of Dixon's motion for postconviction relief on appeal in February 2008. *See Dixon v. State*, 2008 WL 342755 (Del. 2008) (*Dixon II*).

**Discussion**

In his petition for federal habeas relief, Dixon raises three grounds for relief:[2] a) "How can one judge accept my plea while another Judge sentence me? (D.I. 2 at 6);" b) "Rape 1st I was given a natural life sentence instead of the 15 yrs. min. (D.I. 2 at 8);" and c) "Habitual offender how could I be sentence on the habitual when I never did [certain programs] to rehabilitation." (D.I. 2 at 9). Because the Delaware Supreme Court ruled against all of Dixon's claims on state procedural grounds, review of these claims is procedurally barred. Further, because the state supreme court's conclusions on Dixon's claims were not contrary to existing United States Supreme Court precedent, he is not entitled to relief. Accordingly, Dixon's petition should be denied.

Because Dixon's petition was filed in January 2008, it is subject to the Antiterrorism and Effective Death Penalty Act ("AEDPA") signed into law by the President on April 24, 1996. *See generally Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (holding the AEDPA applies to "such cases as were filed after the statute's enactment."); *Lawrie v. Snyder*, 9 F. Supp.2d 428, 433 n.1 (D. Del. 1998); *Dawson v. Snyder*, 988 F. Supp. 783, 802-03 (D. Del. 1997). Because Dixon did not appeal his convictions to the Delaware Supreme Court, his conviction became final thirty days after his sentencing, i.e., June 25, 2007.[3] *See* 28 U.S.C. §2244(d)(1)(A); DEL. SUPR. CT. R. 6; *Hartmann v. Carroll*, 492 F.3d 478, 481 (3d Cir. 2007). Thus, Dixon's petition must have been filed by June 2008 to be timely. Dixon's petition, dated March 10, 2008, was timely filed.

---

[2] Because Dixon has neglected to file a memorandum in support of his federal habeas petition, Respondents will address his claims as they were raised in his state court pleadings. *See generally DeShields v. Snyder*, 829 F.Supp. 676, 678 n. 1 (D.Del;. 1993).
[3] Because the thirty-day period would expire on a Sunday, Dixon's notice of appeal would have been deemed timely the following Monday.

A state petitioner seeking federal habeas relief must first exhaust remedies available in the state courts. 28 U.S.C. § 2254(b); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Rose v. Lundy*, 455 U.S. 509, 515 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Alston v. Redman*, 34 F.3d 1237, 1241-42 (3d Cir. 1994). In order to exhaust state remedies, Dixon must have presented to the state courts the legal and factual basis of the claims which he presents to the federal habeas court. *See* 28 U.S.C. § 2254(b); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Landano v. Rafferty*, 897 F.2d 661, 670-71 (3d Cir. 1990); *Gibson v. Scheidemantel*, 805 F.2d 135, 139 (3d Cir. 1986). In turn, the claim must have been fairly presented to the state's highest court. *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir.1997) (citations omitted). Fair presentation requires that the claim be presented in a manner which permits the state's highest court to consider the merits of the case. *See Castille*, 489 U.S. at 350; *Brown v. Allen*, 344 U.S. 443, 448-49 n. 3 (1953). Though Dixon did not present any argument on the claims he made in his motion for postconviction relief on appeal, the state supreme court nonetheless addressed his claims that he should have been sentenced by the same judge who accepted his plea and that he should not have been sentenced as a habitual offender because he was not offered opportunities for rehabilitation. *See Dixon II*, 2008 WL 342755. Thus, this Court may deem Dixon's first and third claims exhausted. However, because Dixon did not raise any argument on his claim that he should have been given fifteen years rather than a life sentence on appeal from the Superior Court's denial of his motion for postconviction relief, that claim is unexhausted.

*a. Review of Dixon's claims is barred*

Review of all of Dixon's claims is precluded. Dixon could have raised his claims that he should have been sentenced by the same judge who accepted his plea and that he should not have been sentenced as a habitual offender on direct appeal, but did not do so. Because of that failing, the Delaware Supreme Court refused to consider these claims on appeal from the Superior Court's order, citing Delaware Superior Court Criminal Rule 61(i)(3). *Dixon II*, 2008 WL 342755 at *1-2. Delaware Supreme Court Rule 61(i)(3) is an independent and adequate state ground precluding federal habeas review. *Flamer v. Chaffinch*, 827 F.Supp. 1079, 1087-88 (D.Del. 1993); *Gattis v. Snyder*, 46 F.Supp.2d 344, 367 (D.Del. 1999); *Harris v. Reed*, 489 U.S. 255 (1989). "By applying the procedural bar of Rule 61(i)(3), the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-4, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) that its decision rested on state law grounds." *Vanlier v. Carroll*, 535 F.Supp.2d 467, 483 (D.Del. 2008). Thus, federal habeas review is barred unless petitioner has shown cause for his procedural default and resulting prejudice. *Hubbard v. Carroll*, 2003 WL 277252 at *2 (D. Del. 2003) (citing *Wainwright v. Sykes,* 433 U.S. 72 (1977)).

As cause for his default, Dixon states that he was "never told about a direct appeal." (D.I. 2 at 7). Interpreting Dixon's claim liberally, he appears to argue that his attorney was ineffective for failing to inform him of his appellate rights. Dixon, however, has apparently never before claimed that his attorney was ineffective for failing to inform him of his appellate rights. Because Dixon did not present his ineffectiveness claim on appeal to the Delaware Supreme Court, it is itself procedurally defaulted as unexhausted. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000). Dixon's procedural

default on his substantive claims, therefore, cannot be excused by his counsel's alleged errors.

Further, because Dixon did not allege in his appeal from the denial of postconviction relief that he should only have been sentenced to the minimum sentence for which he was eligible on the rape conviction, the claim is unexhausted. If, however, there is no available state remedy, then Dixon is excused from the exhaustion requirement. *See Teague v. Lane*, 489 U.S. 288, 298 (1989); *Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001). Because Dixon failed to raise this particular claim in *Dixon I*, he is procedurally barred from raising the claim in subsequent post-conviction filings. *See* DEL. SUPER. CT. CRIM. R. 61(i)(2). Dixon's claim that he should only have received the minimum sentence is, therefore, excused from the exhaustion requirement, but procedurally defaulted. Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates cause for the default and resulting prejudice, or a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Dixon has not alleged cause for his failure to raise his ineffectiveness claim on appeal of the Superior Court's decision in *Dixon I*. As a result, Dixon has not established cause for his procedural default, and that is sufficient to warrant dismissal of his federal claims. *E.g., Elliott v. Kearney*, 2004 WL 724958, *4 n.5 (D. Del. Mar. 31, 2004); *See also Coleman*, 501 U.S. at 757; *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Carter v. Neal*, 910 F. Supp. 143, 151 (D. Del. 1995) (citing cases).

Conclusion

Based upon a review of the record, it appears that transcripts of Dixon's guilty plea, habitual offender hearing, and sentencing have been prepared. In the event that the Court directs the production of any transcript, respondents cannot state with specificity when such transcript would be available. However, respondents reasonably anticipate that such production would take 90 days from the issuance of any such order by the Court.

/s/ James T. Wakley
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
DATE: September 2, 2008                          Del. Bar. ID No. 4612



## Narrative Inquiry: 7006002955

**ADDITIONAL INFO:**

Complaint Information

Suspect Information

Victim Information

Narrative

ON 9/3/06 AT APPROX. 0400HRS. I, CPL.CALLOWAY, WAS CONTACTED BY LT.RICHARDSON REF. TO A ROBBERY THAT HAD JUST OCCURRED AT THE SHORE STOP IN LAUREL. I WAS ADVISED BY LT.RICHARDSON THAT PFC.CAMPBELL WAS SECURING THE SCENE AT SHORE STOP. AT THAT POINT I RESPONDED. UPON ARRIVAL I MADE CONTACT WITH PFC.CAMPBELL. PFC.CAMPBELL ADVISED THAT HE WAS DISPATCHED AT APPROX. 0355HRS. TO THE SHORE STOP FOR A ROBBERY THAT HAD JUST OCCURRED. PFC.CAMPBELL STATED THAT SUSCOM ADVISED THAT THE SUSPECT WAS A BLACK MALE WEARING A RED SHIRT AND RED PANTS LAST SEEN RUNNING TOWARDS 5 POINT ( NORTH ON CENTRAL AVENUE). PFC.CAMPBELL ADVISED THAT HE WAS ADVISED THAT THE VICTIM WAS POSSIBLY RAPED DURING THE ROBBERY. AT THAT POINT I MADE CONTACT WITH THE VICTIM ,M██ G█████, (DATE OF BIRTH 2/6/34) WHO WAS BEHIND THE COUNTER CRYING AND VERY UPSET. I ASKED M██ IF SHE COULD TAKE HER TIME AND WALK ME THROUGH WHAT HAD HAPPENED. M██ ADVISED THAT SHE WAS OUTSIDE CLEANING WHEN SHE OBSERVED A BLACK MALE WALK UP. M██ STATED THAT SHE ASKED THE SUBJECT IF SHE COULD HELP HIM. THE SUSPECT STATED YES. AT THAT POINT M██ WALKED TOWARDS THE DOOR, WHICH THE SUSPECT OPENED FOR HER. ONCE INSIDE THE STORE THE SUSPECT APPROACHED HER FROM BEHIND AND GRABBED M██ AROUND THE THROAT. M██ ADVISED THAT SHE STARTED TO SCREAM AND KICK. THE SUSPECT ADVISED HER TO STOP YELLING. AT THAT POINT THE SUSPECT FORCED HER TO THE REAR STORAGE ROOM AND INTO THE BATHROOM. WHILE FORCING HER TO THE REAR OF THE STORE THE VICTIM FELL ON THE FLOOR AND THE SUSPECT FELL ON TOP OF HER CAUSING M██ TO HURT HER LEFT ARM. ONCE IN THE BATHROOM M██ ADVISED THAT THE SUSPECT RIPPED HER CLOTHING OFF OF HER AND FORCED HER HEAD DOWN TOWARDS THE FLOOR. DUE TO M██ BEING UPSET I'M UNSURE IF THE SUSPECT PENETRATED HER VAGINA AT THAT POINT. THEN M██ ADVISED THAT THE SUSPECT MADE HER SIT ON THE SINK AND WRAP HER LEGS AROUND HIM. M██ ADVISED THAT THE SUSPECT DID PERNITRATE HER AT THAT POINT. M██ STATED THAT THE SUSPECT TOLD HER THAT SHE WAS GOING TO LIKE THIS YOUNG STUFF. M██ STATED THAT THE SUSPECT WAS UNABLE TO STAY ERECT AND GAVE UP. M██ STATED THAT THE SUSPECT TOLD HER NOT TO LOOK UP AT HIM AND IF SHE TOLD ANYONE HE WOULD KILL HER. THE SUSPECT TOOK HIS SHIRT AND PUT IT OVER HIS HEAD TO HIDE HIS FACE. AT THAT POINT THE SUSPECT GAVE M██ HER WORK SHIRT AND PANTS TO PUT ON AND ESCORTED HER TO THE FRONT OF THE STORE. ONCE AT THE FRONT OF THE STORE THE SUSPECT TOLD M██ TO OPEN THE CASH REGISTER AND GIVE HIM EVERYTHING IN IT. M██ OPENED THE DRAWER AND HANDED THE TRAY TO THE SUSPECT. THE SUSPECT REMOVED THE CASH AND FLED THE STORE TOWARDS 5 POINTS. M██ STATED THAT THE SUSPECT WAS A BLACK MALE APPROX. 6'00 182 LBS WEARING A PAIR OF SILKY RED PANTS (LIKE BASKETBALL PANTS), RED SHIRT WITH WHITE SLEEVES. M██ STATED THAT THE SUSPECT HAD A FULL BEARD. M██ ADVISED THAT SHE THINKS THAT THE SUSPECT ONLY GOT ABOUT $40.00 IN US CURRENCY. AT APPROX. 0415HRS CHIEF. WILSON ARRIVED AND ASSISTED IN PROCESSING THE SCENE. I ATTEMPTED TO FINGERPRINT NUMEROUS AREAS AROUND THE CASH REGISTRER AND IN THE BATHROOM, BUT I WAS UNABLE TO OBTAIN ANY PRINTS. WHILE PROCESSING THE BATHROOM, CHIEF WILSON LOCATED A PAIR OF WOMENS UNDERWEAR THAT WERE IN THE SINK AND A SHIRT ON THE FLOOR OUTSIDE THE DOOR. BOTH PIECES OF CLOTHING APPEAR TO HAVE BELONG TO THE VICTIM. BOTH ARTICLES OF CLOTHING WERE PHOTOGRAPHED AND COLLECTED AS EVIDENCE. THE CASH DRAW WAS ALSO COLLECTED AS EVIDENCE. AT THAT POINT M██ WAS TRANSPORTED TO NANTICOKE HOSPITAL BY A CO-WOR

KER. A SHORT TIME LATER THE DISTRICT MANAGER (JEANETTE KENNEDY) ARRIVED AT THE STORE AND ASSISTED ME WITH REVIEWING THE DIGITAL SECURITY TAPE. WHILE WATCHING THE TAPE IT WAS OBSERVED THAT THE SUSPECT ENTERED THE STORE AT APPROX. 0336HRS RIGHT BEHIND THE VICTIM. THE SUSPECT GRABBED THE VICTIM AROUND THE NECK AND FORCED HER DOWN THE ISLE WHERE THE DRINK COOLER IS LOCATED. I OBSERVED THE VICTIM FALL AS SHE GOT TO THE END OF THE ISLE AND THE SUSPECT FELL ON TOP OF HER AND THEN PICKED HER BACK UP. AT THAT POINT THEY GO INTO THE BACKROOM OUT OF CAMERA VIEW. AT APPROX. 0353HRS YOU SEE BOTH THE VICTIM AND SUSPECT WALK FROM THE REAR OF THE STORE. THE SUSPECT HAD HIS SHIRT OVER HIS HEAD TO HIDE HIS FACE. THE SUSPECT WALKED THE VICTIM TO THE CASH REGISTER WHERE YOU SEE THE VICTIM REMOVE THE CASH DRAWER AND HAND IT TO THE SUSPECT. AT THAT POINT THE SUSPECT TRIES TO GO OUT THE SIDE DOOR, BUT IT IS LOCKED. THE SUSPECT THEN GOES TO THE FRONT DOOR AND LEAVES. AS SOON AT THE SUSPECT LEAVES, TWO CUSTOMERS WALK IN. THE VICTIM IS UNABLE TO ID THE TWO CUSTOMERS. FROM THE SECURITY TAPE I WAS ABLE TO SEE THAT THE SUSPECT WAS A BLACK MALE WEARING A RED HAT WITH A WHITE LETTER "H" ON FRONT. THE SUSPECT HAS ON A WHITE TEE SHIRT WITH A BASKET BALL STYLE JERSEY ON. ON THE JERSEY BACK ARE THE NUMBERS "215" IN WHITE. ON THE FRONT THE NUMBERS "215" ARE ALSO IN WHITE WITH SOME WRITING OVER TOP. THE SUSPECT WAS ALSO WEARING REDAND BLACK SHORTS WITH SOME TYPE OF WRITING OVER THE LEFT KNEE. AT APPROX. 0750HRS. I WAS CONTACTED BY THE SANE NURSE MICHELLE NIBLETT AT NANTICOKE HOSPITAL WHO ADVISED THAT A RAPE KIT HAD BEEN COMPLETED AND WAS READY FOR PICK-UP. THE SANE NURSE DID ADVISE ME THAT THERE WAS SIGN OF VAGINAL

**EXHIBIT A**

INTERCOURSE TO THE VICTIM. AT 0810HRS. I RESPONDED TO THE LAKESIDE MOTEL ON RT.13. I WENT FROM DOOR TO DOOR SHOWING THE PICTURES THAT WE HAD OF THE SUSPECT. A SUBJECT IN ROOM 4 THINKS THAT HE HAS SEEN THE SUSPECT WORKING AT THE FARMERS MARKET ON RT.9 SOMETIME DURING THE WEEK. AT 0829HRS. I RESPONDED TO THE FARMERS MARKET AND SHOWED THAT PICTURE TO EVERYONE I COULD FIND. ONLY ONE SUBJECT ADVISED THAT HE HAD SEEN A SUBJECT WEARING THAT SHIRT AND MATCHING THAT DESCRIPTION, BUT WAS UNSURE WHERE HE HAD SEEN HIM AT. AT APPROX. 1145HRS. I STOPPED BY THE SHORE STOP AND MADE CONTACT WITH KENNEDY. KENNEDY ADVISED THAT SHE DID NOT HAVE A TOTAL ON WHAT WAS TAKEN FROM THE CASH DRAWER, BUT THEY DID KNOW THAT A MARKED $2.00 BILL. THE SERIAL NUMBER OF THE BILL HAD BEEN RECORDED AND STORED IN THE OFFICE IN CASE THEY EVER GOT ROBBED. THE SERIAL NUMBER ON THE BILL IS F36708474B.

**Supplement Narrative: 001**

ON 9/4/06 I, CPL.CALLOWAY, RECEIVED INFORMATION FROM SGT.SIMMON ABOUT THE ROBBERY THAT HAD OCCURRED ON 9/3/06 AT SHORE STOP IN LAUREL. SGT. SIMMONS ADVISED THAT COLLEEN DOBSON THAT WORKS AT SHORE STOP, SAW THE PICTURE ON THE NEWS AND STATED THAT THE SUBJECT WAS JAMIE DIXON. ON 9/5/06 I WAS CONTACTED BY PFC.KOMLO WHO ADVISED THAT HE HAD RECEIVED INFORMATION THAT JAMIE DIXON WAS THE SUSPECT IN THE ROBBERY AT SHORE STOP. PFC. KOMLO WAS ABLE TO CONTACT PROBATION AND PAROLE IN SEAFORD AND OBTAIN A NEW PHOTOGRAPH OF DIXON. ON 9/5/06 I ALSO RECEIVED A CALL FROM CHIEF WILSON. CHIEF WILSON STATED THAT HE HAD RECEIVED A CALL FROM DET.CONAWAY AT TROOP 4. DET.CONAWAY ADVISED THAT HE HAD RECEIVED A CALL FROM TOWANDA MILLER. MILLER ADVISED DET.CONAWAY THAT THE SUSPECT IN THE PHOTOS ON THE NEWS WAS JAMIE DIXON. ON 9/5/06 AT 1545HRS. I RECEIVED A CALL FROM CHIEF WILSON. CHIEF WILSON ADVISED ME THAT JAMIE DIXON HAD BEEN ARRESTED FOR CRIMINAL IMPERSONATION AND WAS BEING PROCESSED AT THE LAUREL POLICE DEPARTMENT BY PFC.COLEMAN. AT THAT POINT I RESPONDED TO THE LAUREL POLICE DEPARTMENT TO INTERVIEW JAMIE DIXON. AT APPROX. 1645HRS I ESCORTED JAMIE DIXON INTO THE DETECTIVES OFFICE TO INTERVIEW DIXON. ONCE IN THE DETECTIVES OFFICE I ASKED DIXON HOW FAR HE WENT IN SCHOOL. DIXON STATED THAT HE HAD GONE TO THE 11TH GRADE. I ASKED DIXON IF HE COULD READ AND WRITE ENGLISH OKAY. DIXON ADVISED THAT HE COULD. AT THAT TIME I GAVE DIXON A LAUREL POLICE DEPARTMENT MIRANDA WARNING FORM. I ASKED DIXON TO READ STATEMENT 1 THROUGH 6 AND INITIAL EACH ONE IF HE UNDERSTOOD. THEN I ADVISED DIXON TO SIGN THE LAST LINE IF HE WAS WILLING TO TALK TO ME WITHOUT AN ATTORNEY PRESENT. DIXON SIGNED THE LAST LINE. AT THAT POINT I ADVISED DIXON THAT THE INTERVIEW WAS GOING TO BE VIDEO TAPED AND AUDIO TAPED. AT THAT POINT I STARTED BOTH TAPES AT APPROX. 1646HRS. DURING THE COURSE OF THE INTERVIEW DIXON ADVISED THAT HE WAS HARD UP FOR MONEY. I ASKED DIXON IF HE PLANNED TO ROB THE STORE OR IF IT WAS THE SPUR OF THE MOMENT. DIXON STATED THAT IS WAS SPUR OF THE MOMENT. DIXON STATED THAT PRIOR TO THE ROBBERY HE WAS JUST WALKING AROUND. I ASKED DIXON HOW THE SHIRT GOT RIPPED OFF THE CLERK. DIXON STATED THAT THE SHIRT POPPED OFF WHEN HE GRABBED HER WHEN SHE TRIED TO RUN. I ASKED DIXON WHY HE WAS GOING IN THE BACKROOM. DIXON STATED THAT HE WAS GOING TO HAVE SEX WITH THE VICTIM, BUT CHANGED HIS MIND. AT THAT POINT I ASKED DIXON TO TELL WHAT HAPPENED FROM BEGINNING TO END. DIXON STATED THAT HE SAW THE VICTIM OUTSIDE WHEN HE CAME UP TO THE STORE. THE VICTIM ASKED DIXON IF HE NEEDED ANYTHING. DIXON STATED YES. DIXON STATED WHEN THEY WENT INTO THE STORE THE VICTIM MUST HAVE KNOWN SOMETHING WAS UP BECAUSE SHE STARTED TO TAKE OFF. DIXON ADVISED THAT HE GRABBED THE VICTIM AND AT THAT POINT HER SHIRT RIPPED OFF. DIXON ADVISED THAT IN THE BATHROOM,HE TOOK THE VICTIMS PANTS OFF AND SHE WAS LAYING ON THE FLOOR ON HER BACK. DIXON STATED THAT HE WAS GOING TO HAVE SEX WITH THE VICTIM, BUT CHANGED HIS MIND. DIXON STATED THAT HE JUST GOT THE MONEY AND LEFT. I ASKED DIXON WHO MUCH MONEY HE GOT AND HE STATED THAT HE DID NOT KNOW. I THEN ASKED DIXON WHAT HE DID WITH THE MONEY. DIXON STATED THAT HE SPENT IT ON WEED AND ALCOHOL. I ASKED DIXON WERE THE CLOTHES THAT HE WAS WEARING THAT NIGHT. DIXON ADVISED THAT HE THREW THE SHORTS IN A TRASH CAN BECAUSE HE KNEW THE TRASH WAS COMING THE FOLLOWING DAY. I ASKED DIXON WHERE THE SHIRT WAS. DIXON STATED THAT HE THREW IT OVER A FENCE, BUT WAS NOT SURE WHERE THE FE

**Supplement Narrative: 001**

NCE IS. AT THAT POINT THE INTERVIEW WAS OVER. AT THAT POINT PFC.COLEMAN TOOK DIXON OUTSIDE TO SMOKE. WHILE OUTSIDE PFC.COLEMAN ASKED DIXON WHEN HE SHAVED HIS BEARD OFF. DIXON ADVISED THE NEXT DAY AFTER THE ROBBERY. AT APPROX. 1739HRS. I CONTACT TOWANDA MILLER. MILLER ADVISED THAT THE SUSPECT IN THE PHOTOGRAPH ON THE NEWS WAS JAMIE DIXON. MILLER STATED THAT DIXON WAS AT A FAMILY BARBECUE ON SUNDAY WEARING THE SAME OUTFIT. MILLER STATED THAT DIXON IS A FRIEND OF THE FAMILY. MILLER STATED THAT DIXON WAS JUST RELEASED FROM JAIL APPROX. 2 WEEKS AGO AND WAS IN JAIL FOR A ROBBERY. MILLER STATED THAT ON 9/2/06 AT APPROX. 2230HRS. SHE STOPPED AT SHORE STOP TO GET GET GAS AND OBSERVED DIXON WALKING BACK AND FORTH BEHIND THE INSURANCE MARKET. THE INSURANCE MARKET IS RIGHT ACROSS THE STREET FROM SHORE STOP. DIXON WAS TRANSPORTED TO JP#4 WHERE HE WAS SEEN AND COMMITTED TO SCI ON THE FOLLOWING BONDS BY JUDGE O'BEIR. FIRST DEGREE RAPE HELD WITHOUT BOND ASSAULT FIRST ROBBERY FIRST UNLAWFUL IMPRISONMENT COMMITTED ON $101,000 CASH BAIL ONLY

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2008, I electronically filed the attached documents with the Clerk of Court using CM/ECF. I also hereby certify that on September 2, 2008, I will mail, by United States Postal Service, the same documents to the following non-registered participant:

Jamie S. Dixon
SBI # 00219854
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

/s/ James T. Wakley
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 4612
james.wakley@state.de.us

Date: September 2, 2008

8